IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL BRYSON, | ) | Case No. 1:20-cv-1137 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Michael Bryson, seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for supplemental security income ("SSI") under Title XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. § 1383(c)(3), and Local Rule 72.2(b).  Because I conclude that the Administrative Law Judge ("ALJ") failed to apply proper legal standards in evaluating whether Bryson had an impairment that met or medically equaled the criteria of Listing 1.04, I recommend that the Commissioner's final decision denying Bryson's application for SSI be VACATED and that his claim be remanded to the Commissioner for further consideration consistent with this R&R.

## I.      Procedural History

Bryson applied for SSI on August 14, 2017.  (Tr. 131-36).[1]  Bryson alleged that he became disabled on October 14, 2015[2], due to: "1. Back Problems – Herniated Discs; 2. TJD

---

[1] The administrative transcript is in ECF Doc. 12.
[2] Because Bryson sought only SSI, the relevant period for his claim began in September 2017 – the month after he filed his application.  20 C.F.R. § 416.335.

Disorder; 3. Pinched Nerve in Neck; [and] 4. Swollen Collarbone."  (Tr. 131, 166).  The Social

Security Administration denied Bryson's claim initially and upon reconsideration.  (Tr. 61-85,

88-90, 94-98).  Bryson requested an ALJ hearing.  (Tr. 99).  ALJ Traci Hixson heard the case on

January 17, 2019 and denied the claim in a May 1, 2019 decision.  (Tr. 9-60).  On March 23,

2020, the Appeals counsel denied further review, rendering the ALJ's decision the final decision

of the Commissioner.  (Tr. 1-6).  And, on May 26, 2020, Bryson filed a complaint to obtain

judicial review.  ECF Doc. 1.

## II.   Evidence

### A.   Personal, Educational, and Vocational Evidence

Bryson was born on March 5, 1971, and he was 44 years old on the alleged onset date.

(Tr. 131).  Bryson had an eleventh-grade education.  (Tr. 35).  And he had previous work

experience as a cleaner and a material handler.  (Tr. 39-40, 53).

### B.   Relevant Medical Evidence

On April 18, 2016, Dean Erickson, MD, conducted an independent medical evaluation of

Bryson related to his claim with the Board of Worker's Compensation.  (Tr. 370).  Dr. Erickson

recounted that Bryson was injured in October 1999[3], resulting in low back pain and the diagnosis

of a contusion.  (Tr. 371).  He underwent a laminectomy/discectomy in September 2001,

improved after therapy, and performed temporary or intermittent work as a laborer through the

date of the evaluation.  (Tr. 372).  In November 2015, Bryson started complaining about pain and

numbness in his legs, and x-rays on February 11, 2016 showed disc space narrowing at the L4/5

and L5/S1 levels.  (Tr. 372).  Bryson told Dr. Erickson that he had low back pain and numbness

---

[3] Three large shipping crates (each containing 1200 pounds of resin) were improperly stacked on each other.  The top one fell.  It pinned Bryson against another shipping container until a forklift cleared enough debris to free him.  (Tr. 371).

in his lower extremities, he used ibuprofen and Percocet, and he had a back brace. (Tr. 373). On examination, he was cooperative and had mild discomfort in his lumbar spine, mild midline axial spine pain on facet compression, buttock pain at 75 degrees straight leg raise, decrease sensation, no reflex changes, and no evidence of atrophy or focal weakness. (Tr. 373-74). Dr. Erickson noted that Bryson had completed his injury treatment 14 years before the evaluation, and that there had been no definite exacerbation, flare up, or aggravation of his condition that would warrant reinitiating therapy. (Tr. 375).

On July 14, 2016, David Lawrence, MD, took an MRI of Bryson's lumbar spine. (Tr. 357-58). Dr. Lawrence found that vertebral body heights and alignment were maintained, but there was diffuse intrinsic narrowing of the central canal. (Tr. 357). He determined that Bryson had moderate to severe central canal, moderate to severe right foraminal and moderate left foraminal stenosis. (Tr. 358).

On October 26, 2016, Bryson saw Michael Bennett, ANP, for a physical. (Tr. 790). Bryson told Bennett that he was attending physical therapy, said he'd injured his shoulder in April 2016, and he asked for an MRI referral. (Tr. 790). Examination showed tenderness and moderate pain with range of motion in the neck, cervical spine, thoracic spine, and lumbar spine. (Tr. 793). His left shoulder was tender and had severe pain on motion, and his left hand was numb with mildly reduced range of motion. (Tr. 793). His right shoulder and hand were normal. (Tr. 793). Bennett diagnosed Bryson with low back pain, shoulder pain, osteoarthritis of the spine with radiculopathy, and myalgia. (Tr. 794).

On January 12, 2017, Bryson went to the emergency room after a motor vehicle accident. (Tr. 238). Bryson told Sean Abraham, DO, that he had neck, back, and shoulder pain, but he was able to ambulate after the accident. (Tr. 238). A CT scan of his cervical spine showed that the

3

vertebral bodies were in anatomic alignment, but there was spondylosis most pronounced at the C6/7 level.  (Tr. 237-38, 285-86).  Examination showed that he was fully oriented, appeared comfortable, and had intact range of motion in all extremities, full strength in all extremities, no joint swelling, and appropriate mood/behavior.  (Tr. 239).

On April 30, 2017, John Haaga, MD, conducted a vascular ultrasound of Bryson's left lower extremity after he'd reported pain/swelling in his left calf and posterior knee.  (Tr. 241). Dr. Haaga determined that there was no ultrasonographic evidence for deep vein thrombosis ("DVT") within the evaluated veins, but there was an occlusive thrombus within a left posterior tibial vein consistent with DVT.  (Tr. 241).

On May 3, 2017, Bryson saw Grant Potter, MD, to establish care after his DVT.  (Tr. 279).  Bryson told Dr. Potter that he'd been compliant with medications, went to physical therapy three days a week, and went to pain management for his lumbar back pain.  (Tr. 279). Bryson also reported pain, numbness, and tingling in his arms, as well as difficulty grabbing and holding things.  (Tr. 279).  Bryson denied difficulty walking and didn't use an assistive device. (Tr. 280).  Examination showed 5/5 strength in his upper and lower extremities, but he had 4+/5 strength in his left-hand grip.  (Tr. 281).  He had some pain on left shoulder rotation.  (Tr. 281). Dr. Potter continued Bryson's medication for his occlusive thrombus and referred him to physical therapy for his left shoulder and cervical spine radiculopathy.  (Tr. 282).

On May 5, 2017, Christopher Young, MD, noted that diagnostic imaging of Bryson's left shoulder showed moderate acromioclavicular osteoarthritis.  (Tr. 246).  On July 3, 2017, Dr. Young found that he had triscaphe and carpometacarpal osteoarthritis bilaterally.  (Tr. 247, 811).

On June 5, 2017, Bryson saw Josue Limage, MD, for chronic left shoulder pain, muscle spasms, and chronic wrist pain.  (Tr. 275).  Bryson said that he'd worn a wrist brace for six

4

months, he had tingling in his wrist, and Percocet controlled his shoulder pain.  (Tr. 275).  He didn't need assistance walking and didn't use an assistive device.  (Tr. 275).  Examination showed tenderness in the left shoulder and AC joint.  (Tr. 277).  Dr. Limage referred Bryson to orthopedics for possible arthritis/carpal tunnel syndrome.  (Tr. 277).

On July 3, 2017, Bryson told John Shaffer, MD, that he'd had neck issues with radicular pain and swelling through his hands.  (Tr. 780).  Bryson rated his pain as a 10 on a 10-point scale.  (Tr. 780).  Dr. Shaffer also noted that Bryson had been evaluated by a rheumatologist, but he didn't have any ongoing anti-inflammatory rheumatology treatment.  (Tr. 780).  Examination showed pain on range of motion in the neck, tenderness in the back, an ability to elevate arms symmetrically with mild pain, and swelling from the fingertips to the wrist in each hand.  (Tr. 781).  Palpation of the hands did not reveal localized tenderness in the carpal tunnel or cubital tunnel.  (Tr. 781).  And diagnostic imaging showed no bone erosion and no appreciable hypertrophic spurring in the hands.  (Tr. 781).  Dr. Shaffer determined that Bryson's pain was most likely related to arthritis and encouraged him to seek rheumatological treatment.  (Tr. 781).

On August 13, 2017, Bryson went to the emergency room for back, neck, and shoulder pain.  (Tr. 813).  Bryson said that he'd run out of his Percocet and his pain rated 10/10.  (Tr. 813).  Heidi Harris, CNP, noted that Bryson had no acute injury and he was able to ambulate with pain.  (Tr. 813).  Examination showed full range of motion, tenderness in the lumbar midspinal and paraspinal regions, normal sensation, no weakness, and appropriate mood/affect.  (Tr. 814).  Seyed Hayeri-Maybodi, MD, noted that imaging of Bryson's lumbosacral spine showed degenerative disc disease at the L4/5 and L5/S1 levels.  (Tr. 248, 812).  But vertebral body heights and alignments were preserved.  (Tr. 248, 812).  Bryson was diagnosed with L4/5

and L5/S1 degenerative disc disease, and nurse Harris told him to continue with physical therapy and pain management.  (Tr. 815).

On August 28, 2017, Bryson saw Sami Moufawad, MD, for low back pain.  (Tr. 307-10, 691-96).  Bryson told Dr. Moufawad that his pain was worse with movement forward, bending, lifting, standing, and walking.  (Tr. 691).  He didn't use any assistive devices for ambulation.  (Tr. 691).  He had neck pain radiating through his upper extremities.  (Tr. 691).  Oxycodone dropped his pain from 8/10 to 3/10, allowed him to function, and let him enjoy daily living activities.  (Tr. 691).  Examination showed muscle spasm in the lower lumbar area, limited range of motion, pain inhibition in the hips, positive straight leg raise on the right side, decreased sensation to light touch over the right leg, slight decrease in sensation on the left side, weakness, 1/4 deep tendon reflexes in the knees, and weakness in the ankles.  (Tr. 693).  Dr. Moufawad diagnosed Bryson with displacement of the right side of L4/5 intervertebral disc, degenerative joint disease in the lumbar spine, and a lumbar sprain.  (Tr. 695).

On April 12, 2018, Bryson went to the emergency room because he got shot at a bar.  (Tr. 826).  Milad Arshian, DO, noted that Bryson was verbal, oriented, cooperative, and denied any other symptoms.  (Tr. 826).  Imaging showed a bullet was lodged in his chest wall, but there was no evidence of traumatic injuries to his organs.  (Tr. 826).  Examination was negative for decreased range of motion, pain, swelling, and stiffness.  (Tr. 826).  He had full pulses in all extremities, no edema, normal sensation, no weakness, and appropriate mood/affect.  (Tr. 827).  Dr. Arishian gave Bryson a tetanus shot.  (Tr. 827).

On July 30, 2018, Dr. Moufawad noted that he hadn't seen Bryson in a year.  (Tr. 697).  Bryson reported continued back and shoulder pain and said that he was considering injections.  (Tr. 697).  Bryson also said that he was tired and fatigued especially when walking on uneven

surfaces, and he'd limp at the end of the day.  (Tr. 697).  Examination showed full orientation, a limping gait on the right side, no cane or assistive device, positive straight leg raise on the right side, decreased sensation to light touch on the right leg, slight decrease in sensation on the left side, weakness, 1/4 deep tendon reflexes on the knees, and weak ankles.  (Tr. 699).  Dr. Moufawad indicated that he would seek approval for epidural steroid injections followed by four sessions of physical therapy.  (Tr. 699).  On August 28, 2018, Dr. Moufawad noted that Bryson's request for epidural steroid injections was initially denied but approved on appeal.  (Tr. 701).  Examination findings remained the same.  (Tr. 702-03).  On December 12, 2018, Dr. Moufawad noted that Bryson was approved for epidural steroid injections and that his primary care physician had agreed to stop his Eliquis for those injections.  (Tr. 833).  Dr. Moufawad noted that Bryson abused alcohol and warned him that he would not get the injections if he showed up to his scheduled appointment smelling like alcohol.  (Tr. 833-34, 836).

On August 11, 2018, Bryson went to the emergency room for chest pain that started 30 minutes before his arrival.  (Tr. 725).  Bryson said the pain and pressure in his chest began after he was "horsing around" with his cousin and nothing alleviated the pain.  (Tr. 725).  Sharon Tang, MD, and Geoffrey Marple, MD, noted that Bryson had been previously on an anticoagulant due to his history of DVT, but he hadn't taken it for 6 months.  (Tr. 725).  Bryson denied neck pain and stiffness, leg swelling, weakness, and numbness.  (Tr. 725).  Examination showed clear lungs, normal peripheral perfusion and pulses, symmetric pulses in extremities, no edema, and no calf tenderness.  (Tr. 726).  A CT scan and chest x-ray showed no evidence of pulmonary embolism and normal findings (other than the bullet that was still in his chest wall).  (Tr. 734-35).

On August 22, 2018, police took Bryson to the emergency room because he felt suicidal and wanted to jump off a bridge.  (Tr. 754, 758).  At admission, Bryson endorsed auditory hallucinations and said that he'd used alcohol and marijuana.  (Tr. 753-54, 758).  Bryson denied having any extremity pain, calf pain, leg pain, neck pain, back pain, joint pain, ankle swelling, leg swelling, chest pain, weakness, difficulty walking, and loss of sensation.  (Tr. 759). Examination showed full orientation, full range of motion in all extremities, intact sensation, intact motor function, normal tendon function, no tenderness, no edema, and a normal gait.  (Tr. 760).  Bryson was discharged from the emergency room in stable condition.  (Tr. 757).

On August 28, 2018, Bryson told Vicki Noble, MD, that he'd had persistent left-side chest pain and flank pain for two weeks.  (Tr. 819).  Bryson denied any lower extremity swelling, said he'd been active and eating well, and said that he was no longer taking his anticoagulant medication because his DVT issue was resolved.  (Tr. 819).  Examination showed no respiratory distress, no peripheral edema, no joint swelling, intact sensation in all extremities, symmetric 5/5 strength in all extremities, and appropriate mood/behavior.  (Tr. 820).  An EKG was normal.  (Tr. 820).  And an ultrasound showed no fluid buildup.  (Tr. 820).  Dr. Noble advised Bryson to follow up with the trauma surgery clinic.  (Tr. 820).

On November 13, 2018, Usha Mehta, MD, noted that Bryson reported neck, arm, elbow, and hand pain.  (Tr. 800).  Bryson also said that he had swelling in his hands with a history of arthritis.  (Tr. 800).  Dr. Mehta noted that Bryson took Eliquis for his history of blood clots and smoked cigarettes and marijuana daily.  (Tr. 800).  In a patient questionnaire, Bryson indicated that he felt little interest or pleasure in doing things, felt depressed or hopeless, had trouble sleeping, felt tired or without energy, felt bad about himself, and had trouble concentrating when reading or watching television.  (Tr. 801).  Dr. Usha noted that Bryson might meet criteria for

major depressive disorder.  (Tr. 802).  Examination showed tenderness in his cervical spine, left elbow, and right hand.  (Tr. 803).  He also had swelling in both hands, no edema in his extremities, and normal memory.  (Tr. 803-04).

### C.    Board of Worker Compensation Mental Status Evaluations

On January 23, 2017, Bryson saw Raymond Richetta, Ph.D., for a mental status evaluation for the Board of Worker's Compensation.  (Tr. 311-18).  Bryson said that he was "destroyed" mentally.  (Tr. 313).  He was unable to have relationships with his children and friends because he would get mad and say things that he didn't remember, but he still saw his girlfriend "almost every day."  (Tr. 313, 315).  Bryson said that he walked his dog (without a leash to avoid pulling), and his girlfriend did his chores for him.  (Tr. 315).  Dr. Richetta determined that there was no evidence of loss of awareness, he was in a normal grieving process relative to family deaths, and there was no evidence of psychosis.  (Tr. 315).  He had suicidal ideation, but no intention.  (Tr. 315).  Dr. Richetta diagnosed Bryson with a single episode of moderate major depressive disorder and indicated that psychotherapy and psychotropic medical consultation would benefit him.  (Tr. 317-18).

On August 10, 2017, Bryson saw Michael Murphy, Ph.D., for a mental health evaluation. (Tr. 291-97).  Bryson was cooperative, had no evidence of impaired speech, and communicated clearly and coherently.  (Tr. 292).  Mental status examination showed average intelligence, alertness, full orientation, adequate reality content, an ability to comprehend simple commands, no evidence of cognitive distortion or dysfunction, intact long-term memory, normal abstract reasoning, normal concept formation, normal fund of knowledge, unimpaired judgment, and intact and normal executive functions.  (Tr. 293-94).  Dr. Murphy noted that Bryson reported symptoms of depression, including feelings of worthlessness, lost interest, diminished pleasure,

psychomotor agitation, and suicidal ideation without intent.  (Tr. 294).  Bryson also reported

symptoms of anxiety.  (Tr. 294).  Bryson said his daily activities included doing laundry, using

the telephone, preparing simple meals on occasion, occasionally attending church, briefly

walking, watching television, grocery shopping, going to the gas station/pharmacy, and attending

medical appointments.  (Tr. 294).  Dr. Murphy determined that Bryson met criteria for severe

depression, but that depression was not caused by his 1999 workplace injury.  (Tr. 297).  On

September 24, 2017, Dr. Richetta wrote a letter disagreeing with Dr. Murphy's conclusion that

Bryson's depression was not a result of the 1999 injury.  (Tr. 303-05).

> **D.  Relevant Opinion Evidence**

On September 6, 2017, state medical consultant Teresita Cruz, MD, evaluated Bryson's

physical functional capacity based on a review of the medical record.  (Tr. 65-67).  Dr. Cruz

determined that Bryson could lift and carry up to 50 pounds occasionally and 25 pounds

frequently; stand and/or walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an

8-hour workday; and push and/or pull without limitation.  (Tr. 65).  Bryson could occasionally

crawl and climb ladders, ropes, and scaffolds.  (Tr. 65).  He could frequently stoop, kneel, and

crouch.  (Tr. 65).  And he had no limitation in balancing and climbing ramps and stairs.  (Tr. 65).

He had limited ability to lift overhead with his left arm and limited ability to handle and finger

with his left hand. (Tr. 66).  He had no visual, communicative, or environmental limitations.  (Tr.

66).

On December 17, 2017, state medical consultant William Bolz, MD, evaluated Bryson's

physical functional capacity on reconsideration.  (Tr. 78-80).  Dr. Bolz determined that Bryson

could lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand and/or walk

for up to 4 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push

and/or pull without limitation.  (Tr. 78-79).  He could occasionally climb ramps and stairs, stoop, crouch, and crawl; frequently balance; and never climb ladders, ropes, or scaffolds.  (Tr. 79).  Dr. Bolz concurred with Dr. Cruz as to all other findings and determined that Bryson was capable of sedentary work.  (Tr. 79-80, 83).

On December 28, 2017, state psychological consultant David Dietz, Ph.D., evaluated Bryson's mental functional capacity based on a review of the medical record.  (Tr. 77, 80-82). Dr. Dietz determined that Bryson was moderately limited in his ability to: (1) understand and remember detailed instructions; (2) carry out detailed instructions; (3) maintain attention and concentration for extended periods; (4) work in coordination with or in proximity to others without being distracted by them; (5) make simple work-related decisions; (6) accept instructions and respond appropriately to criticism from supervisors; (7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (8) respond appropriately to changes in the work setting.  (Tr. 81-82).  Bryson was not significantly limited in his ability to: (1) remember locations and work-like procedures; (2) understand and remember very short and simple instructions; (3) carry out very short and simple instructions; (4) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (5) sustain an ordinary routine without special supervision; (6) complete a normal workday and workweek without interruptions from psychologically based symptoms; (7) perform at a constant pace without an unreasonable number and length of rest periods; (8) interact appropriately with the general public; (9) ask simple questions or request assistance; (10) maintain socially appropriate behavior; (11) adhere to basic standards of neatness and cleanliness; (12) be aware of normal hazards and take appropriate precautions; (13) travel in unfamiliar places or use public transportation; and (14) set realistic goals or make plans independently of others.  (Tr. 81-82).

11

Dr. Dietz further explained that Bryson was "capable of intermittent and infrequent social interaction" and "capable of a static work environment where there are no fast paced production demands and [he] can receive assistance/guidance as needed."  (Tr. 82).

### E.    Relevant Testimonial Evidence

Bryson testified at the ALJ hearing.  (Tr. 34-52).  Bryson said that in the typical day he would watch the news, feed and walk his dog, nap, and talk on the phone.  (Tr. 38).  He smoked half a pack of cigarettes a day, drank two small liquor bottles two weeks before the hearing, and smoked marijuana the day before the hearing.  (Tr. 35).  He didn't drive because his license was suspended.  (Tr. 34-35).  He could use a microwave, but he didn't prepare meals, wash dishes, do laundry, take out the trash, or grocery shop.  (Tr. 36).  His girlfriend handled those chores. (Tr. 36, 39).  He said it was hard to bathe himself, and he needed help getting dressed sometimes. (Tr. 36, 51).  He loved basketball, cars, and swimming, but he didn't do those things anymore. (Tr. 36).  He watched television.  (Tr. 36-37).  And he would visit his family, drink, talk, joke, and play with the children.  (Tr. 37).

Bryson testified that he believed he was disabled because his legs felt heavy, it was hard to get around, and he fell upstairs.  (Tr. 41).  He said that he constantly had shooting pains in his leg, one leg was numb when he woke up, and his elbow also constantly had pain and numbness in it.  (Tr. 41, 47, 50).  He said he couldn't ball up his left hand due to pain, but his right hand wasn't as bad.  (Tr. 41).  He had enough strength to lift a gallon of milk, but he couldn't maintain his grasp on so much as a mug.  (Tr. 45, 47).  His back pain was progressively worse since his 1999 injury and his chest constantly hurt due to his retained bullet.  (Tr. 43).  Medications made him feel sleepy.  (Tr. 45).  And he wasn't in any counseling.  (Tr. 45).  Bryson said that he could walk three houses down the block before he would lock up, and he was prescribed a cane a week

before the hearing.  (Tr. 46).  He could stand for up to an hour, reach in front of himself, hold a pen, write, kneel, and crawl.  (Tr. 46-48).

Bryson said that he became a loner after he was shot, sometimes had difficulty getting along with people, and felt irritable.  (Tr. 48).  He sometimes had trouble remembering things. (Tr. 48).  He didn't sleep well (4-5 hours a day), and he would wake up at 3:00 and doze off in the middle of the day.  (Tr. 50-51).

Ted Massey, a vocational expert ("VE") also testified at the ALJ hearing.  (Tr. 52-??). The ALJ asked the VE whether a hypothetical person with Bryson's age, experience, and education could work if:

> this individual can lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk for 4 hours in an 8-hour day; sit for 6; occasionally climb stairs and ramps, but no ladders, ropes or scaffolding; occasionally balance, stoop, kneel, crouch and crawl.  With the dominant right upper extremity this person is able to reach in all directions.  With the non-dominant left upper extremity this person can reach in front, occasionally overhead.  With the dominant right hand this person is able to handle, finger, and feel.  With the non-dominant left hand this person can frequently handle, finger and feel.  This person would not be exposed to unprotected heights and would perform simple/routine tasks with simple/short instructions, make simple decisions, have few workplace changes with occasional and superficial interaction with coworkers, supervisors, and the public.  Superficial refers to the ability to ask and answer simple questions, give and follow simple direction, understand and incorporate simple correction or criticism.

(Tr. 54).  The VE said that such an individual couldn't perform any of Bryson's past work, but could work in such representative occupations as a table worker (sedentary/unskilled, 54,000 jobs), final assembler (sedentary/unskilled, 90,000 jobs), or bonder (sedentary/unskilled, 40,000 jobs).  (Tr. 54-55).  The VE said that the numbers available for these jobs came from his own experience, the Department of Labor, and the Census Bureau.  (Tr. 55).  If the above-described individual could only frequently handle with the right hand and occasionally handle

with the left, no work would be available.  (Tr. 55).  And, if an individual were absent three times a month, no work would be available.  (Tr. 55-56).

On cross-examination by Bryson's attorney, the VE testified that an employee would be expected to perform his work without assistance or guidance after the probationary period.  (Tr. 56).  If the individual needed guidance beyond that (other than when there was a change in duty), no work would be available.  (Tr. 56-57).  When asked if the jobs identified would be affected by use of a cane, the VE said:

> Not for the . . . jobs I gave examples for as long as the . . . individual had the . . . other capabilities that the judge outlined there that would not be an issue.  Those jobs can be done either seated or standing and the use of a cane would . . . not be a problem . . . unless when the individual was standing, if, if they chose to stand part of the day and were not able to sit, if they had to keep one hand on the cane while they were standing or to, to brace themselves against a chair or a, or a workbench, that would be a problem because, certainly . . . these jobs would require the use of both hands.

(Tr. 57).  Bryson's attorney asked if the ALJ's limitation to simple/routine tasks with short/simple instructions precluded the ability to carry out detailed written and oral instructions, and the VE said it did.  (Tr. 57-58).  The VE also confirmed for counsel that the SVP value assigned to occupations referred only to the amount of time it took to learn a job, and that the DOT, Handbook for Analyzing Jobs, and GED reasoning scale reflected aspects of education that were required for satisfactory job performance, reasoning development, and the ability to follow instructions.  (Tr. 58).

After stating that he had no further questions, counsel said that he would review the occupations that the VE had identified and indicated that he might reach back out to the ALJ.  (Tr. 58).  In closing, Counsel indicated that he would produce Bryson's cane prescription for the ALJ because it had been given the week before the hearing.  (Tr. 59).  Counsel noted that the

cane "wouldn't have an impact on the sedentary occupational base," but Bryson wouldn't be able to perform the jobs identified by the VE because he'd be standing up from time to time.  (Tr. 59).

## III.     The ALJ's Decision

On May 1, 2019, the ALJ issued a written decision denying Bryson's claims.  (Tr. 12-23). The ALJ made the following paraphrased findings relevant to what appear to be Bryson's claims on judicial review:

> 2. Bryson had the severe impairments of degenerative disc disease of the cervical and lumbar spine; degenerative joint disease of the left shoulder, and major depressive disorder.  Bryson also had history of deep vein thrombosis, but it wasn't a severe impairment because there was no evidence of recurrence during the period and no indication of work-related limitations or activity restrictions related to that diagnosis.  (Tr. 14).

> 3. Bryson did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments.  The ALJ discussed Listings 1.02, *Major dysfunction of a joint*, 1.04, *Disorders of the spine*, and 12.04.  But no treating or examining physician had mentioned findings regarding Bryson's physical impairments equivalent in severity to the criteria of any listed impairment, nor did the evidence show medical findings that were the same or equivalent to those of any listed impairment of the Listing of Impairments.  There was no evidence of the requisite neurological, ambulation, or motor deficits to support a listing-level physical impairment.  (Tr. 15).

> 4. Bryson had the residual functional capacity to perform a range of sedentary work, except for the following limitations.  Bryson could lift and carry up to 20 pounds occasionally and up to 10 pounds frequently.  Bryson could stand and walk up to four hours of an eight-hour workday, and could sit for six hours of an eight hour workday.  Bryson could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds.  Bryson could occasionally balance, stoop, kneel, crouch, or crawl.  Bryson could reach, handle, finger, and feel with the right upper extremity.  Bryson could reach in front, and could occasionally reach overhead with the left upper extremity.  Bryson could frequently handle, finger, and feel with the left upper extremity.  Bryson could not work in proximity to unprotected heights.  Bryson could perform simple, routine tasks with simple, short instructions, and could make simple work-related decisions.  Bryson could tolerate only few workplace changes.  Bryson could occasionally engage in superficial interactions with supervisors, coworkers, and the public.  (Tr. 16-17).

> The ALJ considered all of Bryson's alleged symptoms in light of the objective medical and other evidence in the record.  After careful consideration of the

15

evidence, Bryson's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Bryson's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.  Despite evidence showing degenerative changes, examination findings positive for lower extremity weakness, ongoing physical therapy, and pain management services, Bryson had not required additional surgical intervention for his lumbar spine or other impairments.  The objective findings demonstrated antalgic gait at times, but generally Bryson had retained strength, sensation, and joint stability on examination, suggesting his lumbar spine and lower extremity symptoms did not preclude standing and walking for significant periods throughout the day.  While imaging revealed findings that would reasonably limit Bryson's capacity for left overhead reaching and constant use of the hands for manipulative functioning, the evidence demonstrated that he retained use of his hands and upper extremities to drive, to perform some household chores, and to engage in necessary daily activities. Bryson's lack of ongoing treatment for these concerns also suggested that these symptoms were less bothersome than he alleged.  (Tr. 17-19).

The objective evidence and treatment history were inconsistent with Bryson's allegations of disabling mental symptoms.  Psychological evaluations placed Bryson in the average range of intellectual functioning with no cognitive dysfunction.  Despite his complaints of low mood, irritability, and poor motivation due to these depressive symptoms, he was treated minimally for those concerns.  Evidence did not reveal any formal mental health treatment, other than an August 2018 emergency room visit for an acute episode of suicidal ideation related to acute alcohol use, and he did not require hospitalization or other intensive services for his depression. (Tr. 19-20).

The ALJ did not defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical findings or medical opinions.  None of Bryson's own medical sources offered an opinion regarding his work-related physical or mental limitations.  So the ALJ found the state agency medical consultants' and psychological consultants' opinions persuasive. The evidence in the record did not demonstrate that Bryson's physical or mental functioning had significantly worsened since those opinions were issued, because evidence showed continued conservative pain treatment and no additional mental health treatment.  The psychological consultant's opinion adequately considered Bryson's subjective reports of a history of learning difficulties in limiting him to simple, routine tasks that did not require fast pace or rapid changes.  This opinion also considered Bryson's allegations of irritability in assessing limitations on social interaction, although progress notes routinely demonstrated that he was polite and cooperative, and his own reports suggested ongoing interaction with friends, family, and members of the community in a variety of settings.  Mental status findings have generally remained intact for routine cognitive function and social interactions.  (Tr. 20-21).

16

Based on her findings – and the VE's testimony that an individual with Bryson's background and RFC could work as a table worker, final assembler, or bonder – the ALJ found that Bryson was able to perform a significant number of jobs in the national economy and was not disabled from August 10, 2017 through the date of her decision.  (Tr. 22-24).

## IV.    Motion for Supplemental Hearing

After the ALJ hearing, but before the ALJ issued her decision, Bryson filed a motion for a supplemental hearing.  (Tr. 222-30).  Bryson asserted that he was "surprised" by the ALJ's hypothetical questions and the VE's testimony because he couldn't have anticipated the ALJ's RFC finding and the VE didn't submit a pre-hearing report.  (Tr. 222).  Bryson submitted a rebuttal opinion letter from Mark Heckman, M.Ed., CRC, LPC, disagreeing with certain portions of the VE's testimony.  (Tr. 223-26).  Bryson asserted that, if the ALJ did not think a supplemental hearing was necessary, he should be permitted to submit interrogatories to the VE to address the conflicts raised in Heckman's opinion letter.  (Tr. 224).

In her May 1, 2019, decision, the ALJ specifically addressed and denied Bryson's motion for a supplemental hearing.  (Tr. 22-23).  The ALJ thoroughly summarized the content of Heckman's opinion letter, but noted that Bryson had not submitted a valid reason why Heckman's opinion should be substituted for the VE's testimony when the opinion letter was not made under oath and Bryson did not disclose whether Heckman was compensated or impartial. (Tr. 22, 24).  The ALJ also noted that Bryson had not shown "surprise" entitling him to a supplemental hearing because: (1) the RFC and ALJ's hypothetical question reflected a similar RFC to that found in prior administrative adjudications; (2) counsel had access to Bryson's electronic record; and (3) counsel had the ability to question Bryson about his impairments and past work.  (Tr. 23).

17

## V.      Law & Analysis

### A.      Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'" *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)). Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Jones*, 336 F.3d at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error

prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy.  20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step

Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 416.912(a).

### B. Step Two: Deep Vein Thrombosis as a Severe Impairment[4]

Bryson argues that the ALJ erred in failing to find that his DVT was a "severe impairment" at Step Two. ECF Doc. 15 at 10-11. Bryson asserts that this was an error because "this impairment affected [his] ability to perform work-related activities" and "limited [him] to the sedentary level of exertion." ECF Doc. 15 at 11. Bryson also asserts that the "[f]ailure to include and consider the effects of his history of DVT was harmful error in this matter." ECF Doc. 15 at 11.

The Commissioner responds that Bryson hasn't met his burden to show that the ALJ should have found his DVT was a "severe impairment" because he has not pointed to any limitations in his ability to perform work activity that DVT purportedly caused. ECT Doc. 16 at 9. The Commissioner also argues that any error in failing to find that Bryson's DVT was a "severe impairment" was harmless because the ALJ considered all of his symptoms at Step Four – including his history of DVT and blood clots. ECF Doc. 16 at 9-10.

At Step Two, a claimant has the burden to show that he has *at least one* "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii), (c). A "severe impairment" is a medical condition that has more than minimal effect on mental or physical function and is expected to last for 12

---

[4] For ease of analysis, the disparate arguments scattered across the three argument subsections in Bryson's merits brief are reorganized in this R&R to fit within the five-step analytical framework for Social Security cases. Any arguments that might be lost in the distillate are forfeited for insufficient articulation. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs."); *Emerson v. Novartis Pharms. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (agreeing with the Seventh Circuit that judges are not truffle-hunting pigs); *see also Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985) (Even when an unrepresented litigant is entitled to liberal construction, judges are not transformed into "mind readers[ and] they cannot be expected to construct full blown claims from sentence fragments.").

months or cause death.  20 C.F.R. §§ 404.1509, 404.1522; *Salmi v. Sec'y of Health & Human Servs.*, 744 F.2d 685, 691 (6th Cir. 1985).  This is a threshold inquiry "intended to 'screen out totally groundless claims.'"  *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 576 (6th Cir. 2009) (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 (6th Cir. 1985)).  If the claimant doesn't show he has *at least one* "severe" impairment, he's categorically *not* disabled.  20 C.F.R. § 404.1520(c).  If he does satisfy this minimal burden, the ALJ has to consider *all of his impairments* (even ones that aren't "severe") at the remaining steps in the sequential evaluation.  *Nejat*, 359 F. App'x at 577 (quoting SSR 96-8p, 1996 SSR LEXIS 5 (Jul. 2, 1996)).  And, so long as the ALJ considers all the claimant's impairments in the other steps, any Step Two error is harmless.  *Nejat*, 359 F. App'x at 577 (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)).

Even if we agreed with Bryson that the ALJ should have found that his DVT was a "severe impairment" – and I don't recommend that we do[5] – any error in the ALJ's failure to do so was harmless at worst.  *Nejat*, 359 F. App'x at 576-77.  This is because the ALJ considered Bryson's DVT (and related hypertension symptoms) in the remaining steps of the sequential analysis.  *Id.*; *see also* (Tr. 15-21) (specifically noting that the ALJ "considered all symptoms" in evaluating Bryson's RFC at Step Four).  Thus, because the ALJ considered *all* of Bryson's severe and non-severe symptoms (including his DVT), any alleged error at Step Two was

---

[5] The ALJ explained that Bryson hadn't produced any medical evidence showing that he'd had a DVT recurrence during the relevant period, and there was no evidence that his DVT caused any work-related limitations.  (Tr. 14).  Moreover, Bryson's continuing hypertension was controlled with medication.  (Tr. 14).  And evidence in the record supported the ALJ's conclusion, including: (1) findings that he had no weakness or other noted symptoms in his follow-up after he'd gone to the ER with a DVT; and (2) Dr. Noble's notes indicating Bryson told her he stopped taking Eliquis because his DVT issue was resolved.  (Tr. 241, 279-81, 819).

harmless and cannot serve as the basis for overturning the ALJ's decision.  *Nejat*, 359 F. App'x at 576-77; *Rabbers*, 582 F.3d at 654.

### C.    Step Three: Listing 1.04 Musculoskeletal Disorders

Bryson next argues that the ALJ erred in finding that he didn't have a condition that met or medically equaled the severity of Listing 1.04 (Musculoskeletal Disorders).[6]  ECF Doc. 15 at 11-14.  He asserts that the ALJ should have found that he met this listing because he had limited motion in his spine, motor loss accompanied by sensory or reflex loss, positive straight leg raise tests, imaging showing degenerative disc disease and cervical radiculopathy, and pain and numbness in his hands.  ECF Doc. 15 at 12; *see also* ECF Doc. 17 at 1-2.  Bryson asserts that his degenerative disc disease in his lumbar and cervical spine, degenerative joint disease in his shoulder, and depression in combination medically equaled the severity of Listing 1.04.  ECF Doc. 15 at 13.  Further, Bryson argues that the ALJ's statement – that "[t]here was no evidence of the requisite neurological, ambulation, or motor deficits to support a listing-level physical impairment" – was an insufficient explanation and failed to draw and accurate and logical bridge between the evidence and the result.  ECF Doc. 15 at 12-14.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in finding that Bryson did not meet or medically equal Listing 1.04.  ECF Doc. 11-13.  Specifically, the Commissioner argues that evidence showing normal strength, no weakness, and normal/intact sensation supported the ALJ's conclusion that he did not have the requisite motor or sensory loss for Listing 1.04.  ECF Doc. 16

---

[6] Bryson's merits brief makes passing references to other listings, but he has not specifically alleged that he met any other listing or point to any evidence that he thinks established listing criteria other than the criteria in Listing 1.04.  ECF Doc. 15 at 11-13.  In the absence of such undeveloped articulation, Bryson has forfeited any claim that he meets any other listing.  *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (issues "adverted to in a perfunctory manner" are forfeited).

at 11-12.  The Commissioner argues that Bryson "misunderstands the evidence" because an MRI that Bryson said showed nerve root compression actually showed only stenosis of the spinal canal and neural foramina.  ECF Doc. 16 at 12.  The Commissioner contends that the lack of evidence showing nerve root compression is fatal to Bryson's Listing 1.04 argument.  ECF Doc. 16 at 12-13.

At Step Three, the claimant has the burden to show an impairment (or combination of impairments) that meets or medically equals all of the criteria of a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1.  20 C.F.R. § 416.920(a)(4)(iii); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001); *Rabbers v. Comm'r of SSA*, 582 F.3d 647, 653 (6th Cir. 2009) ("A claimant must satisfy all of the criteria to meet the listing.").  The ALJ must "actually evaluate the evidence, compare it to [the relevant listed impairment], and give an explained conclusion, in order to facilitate meaningful judicial review." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 416 (6th Cir. 2011).  But the ALJ doesn't have to discuss a listing that the claimant clearly hasn't met.  *Sheeks v. Comm'r of SSA*, 544 F. App'x 639, 641 (6th Cir. 2013).  And if the claimant didn't raise a "substantial question" as to whether a listing was met – *i.e.*, point to specific evidence that demonstrates a reasonable possibility that an impairment or combination of impairments met or medically equaled the criteria of a listing – the ALJ's failure to evaluate that listing isn't reversible error.  *Smith-Johnson v. Comm'r of Soc. Sec.*, 579 F. App'x 426, 432-33 (6th Cir. 2014) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *Sheeks*, 544 F. App'x at 641-42).  If an impairment meets or medically equals the criteria of a listed impairment, the claimant is conclusively disabled; otherwise, the evaluation proceeds to Step Four.  20 C.F.R. § 416.920(d)-(e); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Listing 1.04 sets out criteria for when a claimant is categorically disabled as a result of certain nerve root compression, spinal arachnoiditis, or lumbar stenosis.  20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04.  The nerve root compression[7] criteria require:

> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04.

I agree with Bryson that the ALJ failed to apply proper legal standards in evaluating whether he had an impairment that met or medically equaled the criteria of Listing 1.04.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ started her analysis correctly.  She identified Listing 1.04.  (Tr. 15).  The ALJ also said that "[n]o treating or examining physician has mentioned findings . . . nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment."  (Tr. 15).  And, on its surface, this looks like the requisite "explained conclusion."  *Reynolds*, 424 F. App'x at 416.  But it's not an "actual[] evaluat[ion of] the evidence" with a comparison to the relevant listing criteria.  *Reynolds*, 424 F. App'x at 416; *see* (Tr. 15) (omitting any discussion of or citation to evidence in the record).  Ordinarily, even that can be overlooked.  When an ALJ's decision is read as a whole and with common sense, an ALJ's discussion of evidence under Step Four can often serve as a proxy for how the ALJ viewed the evidence in reaching Step Three conclusions.  *See Buckhannon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("There is no requirement of . . . tidy packaging . . . we read the ALJ's decision as a whole and with common sense."); *see*, *e.g.*,

---

[7] Because Bryson's argument on judicial review alleges only that he met the criteria for categorically disabling nerve root compression under Listing 1.04A (ECF Doc. 15 at 12), any argument that he met the criteria for categorically disabling spinal arachnoiditis or lumbar stenosis under Listing 1.04B-C is forfeited.  *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010).

*Rodriguez v. Saul*, No. 2:18-cv-5414, 2020 U.S. Dist. LEXIS 117677, at *24 (D.N.J. Jul. 2, 2020) (finding that an ALJ's discussion of evidence at Step Four supported the ALJ's Step two conclusions).

But in this case, the ALJ's discussion of evidence at Step Four and conclusion that there were no findings meeting the severity of a listing don't appear to add up. In discussing the evidence at Step Four, the ALJ specifically noted that: (1) Bryson's diagnostic findings and treatment history were *consistent* with his allegations limiting his ability for prolonged standing, walking, or lifting; (2) imaging showed narrowing of the spinal canal, multilevel degenerative changes, severe central canal stenosis, and moderate to severe foraminal stenosis bilaterally; (3) examination showed lower extremity weakness, diminished reflexes, and positive straight leg raise tests; and (4) although Bryson had a treatment gap from August 2017 to July 2018, examination showed his pain got *worse* over that period. (Tr. 18-19). Having said the record contained such evidence, the ALJ's bare-bones Step Two statement that no evidence established the criteria of Listing 1.04 requires too much of a cognitive leap of faith for meaningful review. *Reynolds*, 424 F. App'x at 416. The ALJ needed to explain why such medical findings weren't the evidence of nerve root compression, pain, limited motion in the spine, motor loss, sensory reflex loss, and straight leg raising that Listing 1.04A contemplates. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04. And, even if not an express violation of the regulations, the ALJ's failure to provide such an analysis resulted in the failure to build an accurate and logical bridge between the evidence and the result. *Reynolds*, 424 F. App'x at 416; *Fleisher*, 744 F. Supp. 2 at 877.

The ALJ's failure to apply proper legal standards also wasn't harmless. *Rabbers,* 582 F.3d 647, 654. Because a finding that Bryson met or medically equaled Listing 1.04A would make him conclusively disabled, and the ALJ's own summary of the medical evidence (absent

explanation otherwise) could support a conclusion that he met Listing 1.04A, the court cannot confidently determine that remand for re-evaluation would be a "useless formality." *Kobetic v. Comm'r of Soc. Sec.,* 114 F. App'x 171, 173 (6th Cir. 2004) (quoting *NLRB v. Wyman-Gordon Co.,* 394 U.S. 759, 766 n.6 (1969) (Courts are not required to "convert judicial review of agency action into a ping-pong game.")).

Further, the Commissioner's argument that Bryson's lack of a "nerve root compression" diagnosis forecloses his argument that his back impairments met or medically equaled Listing 1.04 is disingenuous at best. Listing 1.04A doesn't require a claimant to show that a provider issued a formal diagnosis of nerve root compression in order for a claimant's combination of impairments to *medically equal* its criteria. *See generally* 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04. It requires only that a claimant set out *evidence* of nerve root compression *characterized by* pain and the other motor/sensory symptoms described above. 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04. Although a formal diagnosis of nerve root compression would probably be *very* persuasive to establish that criteria for Listing 1.04A were *met*, the absence of such a diagnosis isn't fatal when: (1) evidence establishes spinal degeneration with *severe stenosis*[8]; and (2) the record includes other findings that Listing 1.04A says are characteristics of conclusively disabling nerve root compression. *See* (Tr. 18) (ALJ's summary of the medical evidence); 20 C.F.R. pt. 404, Subpt. P, App. 1 § 1.04. Thus, there is a very real possibility that the ALJ's re-evaluation of Listing 1.04 could result in a different conclusion. *Rabbers,* 582 F.3d at 655-56.

---

[8] Spinal stenosis is the narrowing of the spinal canal and can cause compression on nerve roots resulting in pain or weakness. *Spinal Stenosis*, A.D.A.M. MEDICAL ENCYCLOPEDIA (2021), *available at* Nat'l Inst. of Health, MEDLINEPLUS, https://medlineplus.gov/ency/imagepages/9941.htm (last visited May 12, 2021).

Because the ALJ failed to apply proper legal standards at Step Three and that error wasn't harmless, I will recommend that the ALJ's decision be VACATED and that Bryson's claim be REMANDED for further consideration consistent with this R&R.

### D.     Step Four: Subjective Symptom Complaints

Bryson next argues that the ALJ failed to "make a defensible determination as to whether [his] testimony regarding his pain was credible." ECF Doc. 15 at 15-17.  Bryson asserts that evidence supported his pain complaints, including: (1) findings that he had swollen hands; (2) an x-ray showing osteoarthritis; and (3) his testimony that he had pain in his legs and arms, he had pain when turning his head, and he had trouble holding a razor and getting dressed. ECF Doc. 15 at 16.  Bryson also argues that the ALJ erred in finding that his subjective complaints concerning his depression were inconsistent with other evidence because: (1) he'd gone to the emergency room with suicidal thoughts in 1999; and (2) he testified that he had difficulty getting along with people, became irritated easily, and had problems remembering things. ECF Doc. 15 at 17.  Bryson also argues that the ALJ failed to consider his impediment to treatment (*i.e.*, requiring Board of Worker's Compensation approval for treatment of covered injuries), as evidence by Dr. Moufawad's statement that he'd been approved for epidural steroid injections. ECF Doc. 15 at 20-21.

The Commissioner responds that the ALJ properly explained that she found Bryson's subjective complaints inconsistent with evidence in the record. ECF Doc. 16 at 13-16.  Further, the Commissioner argues that the ALJ considered all the evidence in the record, and substantial evidence supported the ALJ's finding that his alleged limitations were inconsistent with record evidence. ECF Doc. 16 at 13-16.  The Commissioner also contends that Bryson hasn't pointed

to any evidence that the Board of Worker's Compensation didn't approve him for treatment and that the ALJ weighed unapproved treatment against him.  ECF Doc. 16 at 15.

Bryson replies that the ALJ failed to consider his 2001 back surgery, which contradicted the ALJ's statement that he hadn't required additional surgical intervention for his lumbar spine or other impairments.  ECF Doc. 17 at 2.  Bryson also asserts that: (1) Dr. Moufawad's statement that he'd been approved for epidural steroid injections demonstrated that treatment approval was necessary; and (2) the ALJ had relied on the lack of treatment for his hands and depression.  ECF Doc. 17 at 2.

A claimant's subjective symptom complaints are among the evidence that an ALJ must consider when determining a claimant's RFC at Step Four.  *See* 20 C.F.R. § 416.920(e); *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989) ("Subjective complaints of pain or other symptoms may support a claim of disability.").  Before March 2016, the Social Security Administration characterized the evaluation of a claimant's subjective symptom complaints as a "credibility" determination.  *See* SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996).  In SSR 16-3p, the Social Security Administration explained that this characterization did not accurately reflect the language in the regulations and eliminated the term "credibility" from its sub-regulatory policy.  SSR 16-3p, 2016 SSR LEXIS 4 (Oct. 25, 2017).  The Social Security Administration explained that "subjective symptom evaluation is not an examination of an individual's character," but is instead an examination of the subjective complaints' consistency with other evidence in the record.  SSR 16-3p, 2016 SSR LEXIS 4 ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").

28

In conducting this *consistency* analysis, an ALJ is not required to accept the claimant's complaints at face value but may discount them based on several factors, including the claimant's daily activities, the nature of the claimant's symptoms, the claimant's efforts to alleviate his symptoms, the type and efficacy of any treatment, and any other factors concerning the claimant's functional limitations and restrictions. SSR 16-3p, 2016 SSR LEXIS 4, at *15-19; 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Jones*, 336 F.3d at 475–76 ("[A]n ALJ is not required to accept a claimant's subjective complaints."); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013) (stating that an ALJ properly considered a claimant's ability to perform day-to-day activities in determining whether his testimony regarding his pain was credible). An ALJ shouldn't weigh against a claimant's subjective complaints his failure to follow prescribed treatment that might improve his symptoms without considering possible reasons why the claimant didn't comply with treatment. SSR 16-3p, 2016 SSR LEXIS 4, at *23. The ALJ is not required to discuss each of these factors or even all the evidence in the record, but need only acknowledge the factors and discuss the evidence that supports his decision. *See Renstrom v. Astrue*, 680 F.3d 1057, 1067 (8th Cir. 2012); *Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004).

Notwithstanding, the ALJ's failure to apply proper legal standards at Step Three, the ALJ applied proper legal standards in evaluating Bryson's subjective symptom complaints at Step Four. Here, Bryson's arguments regarding the ALJ's "credibility" findings are misplaced. The ALJ did not make *any* findings as to Bryson's "credibility." *See generally* (Tr. 16-21). And for good reason – the regulations say not to do that. SSR 16-3p, 2016 SSR LEXIS 4.

Instead, the ALJ properly explained that she found Bryson's subjective complaints inconsistent with other evidence in the record. 42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.

The ALJ specifically explained that Bryson's allegations concerning the severity, persistence, and limiting effects of his pain and other physical and mental health symptoms weren't consistent with the record and specifically referred to parts of the medical record that were inconsistent with Bryson's subjective complaints.  (Tr. 18-120).  That's exactly the kind of analysis the regulations direct an ALJ to conduct.  SSR 16-3p, 2016 SSR LEXIS 4 *15-19; 20 C.F.R. § 416.929(c)(3).  The ALJ wasn't required to just accept Bryson's allegations at face value.  *Jones*, 336 F.3d at 475-76.  Further, despite Bryson's claims that the ALJ failed to consider his need for Board of Workers' Compensation approval for treatment, the record does not show that: (1) the Board of Worker's Compensation denied him treatment; (2) that any treatment was denied as a result of the Board of Worker's Compensation decision not to cover a condition; or (3) that the ALJ held against Bryson the failure to obtain treatment that the Board of Worker's Compensation didn't approve.  *See generally* ECF Doc. 12 (administrative record); SSR 16-3p, 2016 SSR LEXIS 4, at *23.  Thus, the ALJ applied proper legal standards in evaluating Bryson's subjective symptom complaints.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.

Substantial evidence also supported the ALJ's finding that Bryson's subjective complaints were inconsistent with the record.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  A reasonable person could conclude that Bryson's complaints about pain limiting his ability to walk, stand, and use his arms/hands conflicted with: (1) findings that Bryson had only mild discomfort in his spine, no reflex changes, no evidence of atrophy or weakness, maintained vertebral body heights and alignment, the ability to ambulate, intact range of motion in all extremities, full strength in all extremities, and no swelling, (Tr. 239, 281, 357, 373-74, 760, 814, 820, 827); (2) Bryson's statements to providers denying difficulty walking or the need for an

30

assistive device, (Tr. 280, 691, 699, 759); (3) notes indicating that medication controlled his pain and allowed him to function, (Tr. 275, 691); (4) notes indicating a lack of localized tenderness in his hands on palpation, (Tr. 781); and (5) Dr. Bolz's opinion that he could perform a range of sedentary work, (Tr. 78-80, 83). *Biestek*, 139 S. Ct. at 1154. Likewise, a reasonable person could conclude that Bryson's allegations of disabling mental health symptoms conflicted with: (1) treatment notes indicating that he was cooperative, was fully oriented, had appropriate mood/behavior, and had normal memory (Tr. 239, 373-74, 760, 804, 826); (2) the lack of any ongoing mental health treatment; (3) Board of Workers Compensation evaluators' findings that he had no loss of awareness, no psychosis, full orientation, average intelligence, no cognitive distortion or dysfunction, intact memory, normal abstract reasoning, normal concept formation, normal fund of knowledge, unimpaired judgment, and normal executive function, (Tr. 294, 315); and (4) Dr. Dietz's opinion that he had no more than moderate limitations in a few areas of mental functioning, (Tr. 81-82). *Biestek*, 139 S. Ct. at 1154.

Because the ALJ generally applied proper legal standards and reached a decision supported by substantial evidence in evaluating Bryson's subjective complaints, I would ordinarily recommend that the Commissioner's subjective symptom complaints evaluation be affirmed. Nevertheless, because I recommend vacatur and remand of the ALJ's Step Three findings, the ALJ's analysis at Step Four might ultimately change after the ALJ re-evaluates her conclusions at Step Three.

### E. Step Four: Medical Opinion Evidence

Bryson argues that the ALJ erred in finding that Dr. Dietz's opinion was persuasive, but not incorporating into the RFC finding a limitation that he was only capable of working in a static work environment without fast paced production demands and with guidance for

31

completing tasks. ECF Doc. 15 at 18-19.  Bryson also asserts that the ALJ improperly adopted Dr. Bolz's opinion because evidence in the record showed that his condition had changed since that opinion was issued.  ECF Doc. 15 at 20.

### 1.    Dr. Dietz's Opinion

Even when an ALJ finds a medical source's opinion persuasive or consistent and well-supported, "there is no requirement that an ALJ adopt [a medical source's] limitations wholesale."  *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015).  So long as the ALJ considered the entire record, the ALJ is permitted to make necessary decisions about which medical findings to credit and which to reject in determining the claimant's RFC.  *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 587 (6th Cir. 2013) (unpublished).  However, an ALJ improperly "cherry-picks" evidence when her decision does not recognize a conflict between the functional limitations described in a medical opinion and the ALJ's RFC finding, and explain why she chose to credit one portion over another.  *See Rogers v. Comm'r of Soc. Sec.*, No. 5:17-cv-1087, 2018 U.S. Dist. LEXIS 68715 *44 (N.D. Ohio 2018) (citing *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013)); *see also Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (stating that, if a medical source's opinion contradicts the ALJ's RFC finding, the ALJ must explain why he did not include the limitation in his RFC determination).

I agree that the ALJ failed to apply proper legal standards in failing to incorporate into the RFC each limitation from Dr. Dietz's opinion.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241.  Although the ALJ wasn't required to adopt each limitation from Dr. Dietz's opinion simply because she found the opinion persuasive, she was required to acknowledge and explain inconsistencies between Dr. Dietz's opinion and the ALJ's ultimate RFC finding.  *Reeves*, 618 F.

App'x at 275; *Justice*, 515 F. App'x at 587; *Rogers*, 2018 U.S. Dist. LEXIS 68715, at *44;

*Minor*, 513 F. App'x at 435; *Fleischer*, 774 F. Supp. 2d at 881.  On one hand, most of the ALJ's

RFC finding is *consistent* with Dr. Dietz's opinion that Bryson could work in "a static work

environment where there are no fast paced production demands and [he] can receive

assistance/guidance as needed in order to complete tasks" and was capable of only "intermittent

and infrequent social interaction."  *Compare* (Tr. 81), *with* (Tr. 16-17) (limiting Bryson to

"simple, routine tasks with simple, short interactions, . . . simple work-related decisions, . . .only

few workplace changes[, and only occasional] superficial interactions with supervisors,

coworkers, and the public").  But the RFC finding omits one important feature from Dr. Dietz's

opinion – the limitation to work that doesn't involve "fast paced production demands."  *Compare*

(Tr. 81), *with* (Tr. 16-17).  And, despite specifically recognizing the pace limitation in Dr.

Dietz's opinion (seemingly with *approval*), the ALJ didn't explain why she didn't include it in

her ultimate RFC finding or point to any evidence that was inconsistent with that limitation.  (Tr.

20-21).

  Nevertheless, when the ALJ's opinion is read as a whole, it meets the goals of the

regulations' procedural safeguards by providing an indirect attack on the omitted pace limitation.

*See Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (explaining that when

the ALJ's decision as a whole calls to question the supportability of an opinion or its consistency

with other evidence, it meets the goals of the regulations' procedural safeguards and renders

harmless a failure to strictly comply with them).  Specifically, the ALJ explained earlier in her

written decision that the evidence in the record showed average intellectual function, no

cognitive dysfunction, and a lack of mental health treatment beyond one acute occurrence of

alcohol-related suicidality.  (Tr. 19).  In yet another part of the ALJ's opinion the ALJ explained

that, notwithstanding his lack of motivation and marijuana use, Bryson had no more than a moderate impairment in concentration and pace because he was routinely found to be oriented, had no evidence of cognitive or concentration deficits, and was able to track and answer questions. (Tr. 16). These findings are sufficient to provide some understanding why the ALJ didn't include a mental health-related pace limitation. *See Nelson*, 195 F. App' at 470 (the key question is whether the ALJ's analysis as a whole permits a reviewing court to glean a "clear understanding" why certain limitations were not adopted. Evidence also supported the ALJ's decision to not include a pace limitation, including: (1) treatment notes indicating that Bryson was cooperative, was fully oriented, had appropriate mood/behavior, and had normal memory (Tr. 239, 373-74, 760, 804, 826); (2) the lack of any ongoing mental health treatment; and (3) Board of Workers Compensation evaluators' findings that Bryson had no loss of awareness, no psychosis, full orientation, average intelligence, no cognitive distortion or dysfunction, intact memory, normal abstract reasoning, normal concept formation, normal fund of knowledge, unimpaired judgment, and normal executive function, (Tr. 294, 315). *Biestek*, 139 S. Ct. at 1154. Thus, the ALJ's failure strictly comply with the regulations was harmless error. *Nelson*, 195 F. App' at 470.

### 2. Dr. Bolz's Opinion

An ALJ may rely on a state agency consultant's opinion (and may give it greater weight than any other medical opinions) if that opinion is supported by other evidence in the record. *Reeves*, 618 F. App'x at 274. And so long as the ALJ considers any evidence that the state agency consultant wasn't able to consider, the ALJ is allowed to rely on a state agency consultant's opinion that predates other medical evidence. *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009).

Bryson's hasn't met his burden to show that the ALJ failed to apply proper legal standards in relying upon Dr. Bolz's opinion.  42 U.S.C. § 1383(c)(3); *Rogers*, 486 F.3d at 241. Even though the Dr. Bolz's opinion pre-dated much of the evidence in the record, the ALJ was allowed to rely upon it because she considered all the evidence in the record.  (Tr. 16-21); *McGrew*, 343 F. App'x at 32.  Moreover, the ALJ specifically explained that Dr. Bolz's opinion was consistent even with the evidence that came into existence after his opinion was issued.  (Tr. 20-21); *McGrew*, 343 F. App'x at 32; *Reeves*, 618 F. App'x at 274.  And substantial evidence supported the ALJ's conclusion that Dr. Bolz's opinion was consistent with other evidence in the record, including:  (1) findings that Bryson had only mild discomfort in his spine, no reflex changes, no evidence of atrophy or weakness, maintained vertebral body heights and alignment, the ability to ambulate, intact range of motion in all extremities, full strength in all extremities, and no swelling, (Tr. 239, 281, 357, 373-74, 760, 814, 820, 827); (2) Bryson's statements to providers denying difficulty walking or the need for an assistive device, (Tr. 280, 691, 699, 759); (3) notes indicating that medication controlled his pain and allowed him to function, (Tr. 275, 691); and (4) notes indicating a lack of localized tenderness in his hands on palpation, (Tr. 781). *Biestek*, 139 S. Ct. at 1154.

### 3.    Medical Opinions Conclusion

Because the ALJ's only alleged error in evaluating the medical opinion evidence was harmless, I would ordinarily recommend that the ALJ's evaluation of the medical opinion evidence be affirmed.  Nevertheless, because I recommend vacatur and remand of the ALJ's Step Three findings, the ALJ's analysis at Step Four might ultimately change after the ALJ re-evaluates her conclusions at Step Three.

**F.      Step Five: VE Testimony and Disability Finding**

Bryson appears to argue that the ALJ erred in relying on the VE's testimony in finding that he was able to perform work in the national economy at Step Five. ECF Doc. 15 at 17-18. Specifically, Bryson asserts that the ALJ should not have found him disabled because the VE testified that he couldn't work if he: (1) was limited to frequent handling and fingering with his right hand and occasional handling and fingering with his left hand; or (2) needed assistance and guidance to perform his job. ECF Doc. 15 at 18; *see also* ECF Doc. 17 at 3. The Commissioner responds that the ALJ appropriately relied on the VE's testimony in finding that he was able to perform work in the national economy because that testimony was given in response to a hypothetical question that accurately reflected the ALJ's ultimate RFC finding. ECF Doc. 16 at 18-19.

At the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 416.920(a)(4)(v). An ALJ may determine that a claimant has the ability to adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant has the ability to perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics. *See id.* (stating that "substantial evidence may be produced through reliance on the testimony of a vocational expert (VE) in response to a 'hypothetical' question, but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments" (internal quotation marks omitted)); *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (unpublished) (stating

that the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). "An ALJ is only required to incorporate into a hypothetical question those limitations that [she] finds credible." *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints.").

Notwithstanding my earlier conclusion that the ALJ erred at Step Three, the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence in relying on the VE's testimony at Step Five. 20 C.F.R. § 404.1520(a)(4)(iv); *Howard*, 276 F.3d at 238. Because the ALJ found that Bryson was limited to an RFC representing less than the full range of sedentary work, a VE's testimony was necessary to determine whether an individual with such an RFC could work. *Howard*, 276 F.3d at 238. And, because the ALJ's hypothetical question to the VE accurately represented the ALJ's ultimate RFC finding, the VE's responsive testimony was substantial evidence supporting the ALJ's Step Five finding. *Compare* (Tr. 54), *with* (Tr. 16-17); *Howard*, 276 F.3d at 238. It doesn't matter that the VE gave testimony regarding other limitations that were not incorporated into the RFC. *That* testimony was*n't* substantial evidence because it wasn't given in response to a hypothetical question accurately reflecting the ALJ's RFC finding. *Howard*, 276 F.3d at 238 Moreover, the ALJ wasn't required to incorporate into the RFC or hypothetical question to the VE limitations that she didn't find supported in the evidence. *Lee*, 529 F. App'x at 715.

Because the ALJ applied proper legal standards and reached a conclusion supported by substantial evidence at Step Five, I would ordinarily recommend that the ALJ's evaluation of the medical opinion evidence be affirmed. Nevertheless, because I recommend vacatur and remand

of the ALJ's Step Three findings, the ALJ's analysis at Step Five might ultimately change after the ALJ re-evaluates her conclusions at Step Three.

### G.     Motion for Supplemental Hearing

Bryson argues that the ALJ erred in denying his motion for a supplemental hearing.  ECF Doc. 15 at 21.  Bryson asserts that a supplemental hearing was required because he was surprised that the ALJ didn't include all his alleged limitations in the RFC finding, the RFC finding was adverse to him, there was evidence presented at the hearing that he couldn't have anticipated, and he wasn't prepared to respond to that evidence.  ECF Doc. 15 at 21.  Bryson also states that there was time in which he could have issued interrogatories to the VE because there was a three-month gap between the hearing and the ALJ's decision.  ECF Doc. 15 at 21.

The Commissioner responds that the ALJ properly denied Bryson's motion for a supplemental hearing.  ECF Doc. 16 at 19.  Specifically, the Commissioner asserts that Bryson's claim of surprise is disingenuous because: (1) ALJs routinely ask VEs about limitations similar to those assessed in prior administrative adjudications; (2) ALJs regularly leave out of RFC findings (and hypothetical questions) limitations that the ALJ didn't find consistent with evidence or supported; and (3) Bryson had an opportunity to ask (and actually did ask) the VE about additional limitations that weren't included in the ALJ's hypothetical question.  ECF Doc. 16 at 19.

As an initial matter, it's not clear whether this issue is properly subject to judicial review under 42 U.S.C. § 1383(c)(3).  HALLEX § I-2-6-80 provides that certain circumstances may make a supplemental hearing appropriate, including: (1) testimony or other evidence adduced at a hearing that takes the claimant by surprise, is adverse to the claimant's interest, could not have been reasonable anticipated by the claimant, and to which the claimant isn't prepared to respond;

or (2) the claimant wishes to cross-examine the author of a post-hearing report.  HALLEX § I-2-6-80 (Mar. 18, 2017).  If one of these (or other) enumerated circumstances are satisfied, HALLEX § I-2-6-80 says that an ALJ may choose whether to conduct a supplemental hearing.  *Id.*  And the Supreme Court has indicated that 42 U.S.C. §§ 405(g), 1383(c)(3)'s language limiting review to a "final decision of the Commissioner made after a hearing" doesn't include review of an ALJ's discretionary decisions tangential to the conduct of a hearing.  *Cf. Califano v. Sanders*, 430 U.S. 99, 107-08 (1977); *accord Parker v. Califano*, 644 F.2d 1199, 1201 (6th Cir. 1981).

Nevertheless, courts in this circuit have reviewed whether an alleged violation of HALLEX § I-2-6-80 resulted in a cognizable Due Process violation.  *See*, *e.g.*, *Herndon v. Comm'r of Soc. Sec.*, No. 1:20-cv-885, 2021 U.S. Dist. LEXIS 40128, at *72 (N.D. Ohio, Mar. 3, 2021); *McCormack v. Berryhill*, No. 1:18-cv-60, 2019 U.S. Dist. LEXIS 41121, at *7 (W.D. Ky., Mar. 13, 2019).  Specifically, Due Process requires that a social security hearing be "full and fair."  *Herndon*, 2021 U.S. Dist. LEXIS 40128, at *72 (citing, among other things, *Robinson v. Barnhart*, 124 F. App'x 405, 410 (6th Cir. 2005)).  At a minimum, this requires an opportunity to proffer evidence and confront adverse witnesses.  *See Flatford v. Chater*, 93 F.3d 1296, 1306-07 (6th Cir. 1996).

Nothing in the record suggests that the Bryson's hearing was anything less than "full and fair."  *See generally* (Tr. 30-60); *Herndon*, 2021 U.S. Dist. LEXIS 40128, at *72.  Bryson had a full opportunity to give his own testimony with examination by both the ALJ and counsel, and Bryson (through counsel) had a full opportunity to cross-examine the VE.  (Tr. 30-60).  In an almost mirror-image of the claimant in *Herndon*, Bryson's attorney: (1) submitted a post-hearing brief asking for a supplemental hearing; (2) claimed that he couldn't have reasonably anticipated

the ALJ's findings and hypothetical questions to the VE; (3) claimed he was surprised by the VE's testimony; (4) proffered "rebuttal vocational evidence" consisting of a vocational opinion by Mark Heckman; and (5) asked that the ALJ issue interrogatories as an alternative to a supplemental hearing.  *Compare* (Tr. 222-30), *with Herndon*, 2021 U.S. Dist. LEXIS 40128, at *72-73.  Again as in *Herndon*, the ALJ denied Bryson's request after: (1) explaining no claim of surprise was reasonable when the RFC and hypothetical questions to the VE reflected nearly the same findings in the prior administrative adjudications; (2) noting that Bryson had a full opportunity to cross examine the VE and *did* cross examine the VE; and (3) reviewing Bryson's evidentiary proffer and explaining why she did not find Heckman's report persuasive.  *Compare* (Tr. 22-24), *with Herndon*, 2021 U.S. Dist. LEXIS 40128, at *74.  And, as in *Herndon*, Bryson has not explained how he was denied the opportunity to proffer his own evidence and cross examine adverse witnesses when: (1) the ALJ specifically considered the evidence he proffered; and (2) he had the opportunity to cross-examine the VE at the hearing and availed himself of that opportunity.  (Tr. 22-24, 30-60); *Herndon*, 2021 U.S. Dist. LEXIS 40128, at *72-77; *Robinson*, 124 F. App'x at 410; *Flatford*, 93 F.3d at 1306-07.  Thus, the ALJ didn't abuse her discretion, much less violate Bryson's due process rights, in denying his request for a supplemental hearing.

**VI.**    **Recommendation**

     Because I conclude that the ALJ failed to apply proper legal standards in evaluating whether Bryson had an impairment that met or medically equaled the criteria of Listing 1.04 at Step Three, I recommend that the Commissioner's final decision denying Bryson's application for SSI be VACATED and that his claim be REMANDED for further consideration consistent with this R&R.

Dated: June 10, 2021

                              Thomas M. Parker

                          United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See U.S. v. Walters,* 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).